The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.



Dated: February 16 2017

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 16-31038 |
| | ) | |
| Jason R. Zimmerman and | ) | Chapter 7 |
| Tara L. Zimmerman, | ) | |
| | ) | Adv. Pro. No. 16-3077 |
| Debtors. | ) | |
| | ) | Hon. Mary Ann Whipple |
| John Oliver, Jr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Jason R. Zimmerman, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF DECISION**

This adversary proceeding is before the court for decision after trial on Plaintiff's pro se complaint to determine dischargeability of a debt owed to him by Defendant. Defendant is a debtor in the underlying Chapter 7 case. Plaintiff's complaint is based upon Defendant's failure to complete construction of a pole barn on Plaintiff's property after contracting to do so and after Plaintiff paid him $36,000. According to Plaintiff, Defendant owes him a debt resulting from his fraudulent representations that should be excepted from his Chapter 7 discharge. Although not specifically identified in his complaint, Plaintiff is proceeding under 11 U.S.C. § 523(a)(2)(A).

The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b)

as a civil proceeding arising in or related to a case under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine dischargeability of debts are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I).

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Plaintiff is entitled to judgment that a debt owed him pursuant to a Cognovit Note signed by Defendant is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

## **FINDINGS OF FACT**

Plaintiff entered into a contract with Central Ohio Builders LLC ("the LLC") on August 2, 2009, for the construction of a pole barn on his property. Defendant was the principal of the LLC. The contract provided for payment by Plaintiff as follows:

1. $30,000  Down - PAID TO MATERIAL SUPPLIERS
2. $ 6,000  First Day On Job 1/3
3. $ 6,000  Framing Completion 1/3
4. $ 6,000 Upon Completion 1/3

[Def. Ex. A]. Next to "PAID TO MATERIAL SUPPLIERS" is the handwritten notation, "J & H Construction." [*Id.*]. Information provided to the LLC's customers includes a statement that it "allow[s] the customer to pay our material suppliers direct to assure the rightful property owner that NO liens can be filed." [Pl. Ex. 1B, final ¶ (emphasis in original)].

Plaintiff made a check payable to J & H Construction dated August 2, 2009, in the amount of $30,000. [Pl. Ex. 3A]. The parties' testimony regarding why the check was made payable to J & H Construction differs. According to Defendant, he began talking to Plaintiff about building a pole barn two years before the contract was executed and at a time when he was doing business as J & H Construction. Defendant testified that he had created, and was doing business as, the LLC at the time the contract was signed but Plaintiff had already made the check out to J & H Construction, allegedly the name by which Plaintiff knew the business. According to Defendant, the parties were both in a hurry at the time the contract was signed and thought it "was no big deal," since the bank would accept a check made out to J

& H Construction for deposit in the LLC's account. Defendant testified that he therefore made the handwritten notation "J & H Construction" on the contract next to "PAID TO MATERIAL SUPPLIERS." The court does not find Defendant's testimony credible.

The court instead credits Plaintiff's testimony that he first met with Defendant in early to mid-summer 2009 to discuss building the pole barn. According to Plaintiff, Defendant brought the contract to his home in the evening on August 2, 2009. Plaintiff testified that Defendant had previously told him that he would most likely be purchasing materials for the pole barn from Menards but that, at the time the contract was signed, Defendant told him that he found a supplier in southern Ohio called J & H Construction and that the check should be made payable to that company. As one of the LLC's selling points to its customers is direct payment of material suppliers, Plaintiff's testimony comports with the written information document. And nothing about the parties' described interactions point to a finding of fact that their relationship had commenced years earlier.

Plaintiff's $30,000 check was deposited August 6, 2009, in the LLC's checking account at National City Bank, the account from which all of the LLC's business expenses were paid. On August 10, 2009, Defendant purchased framing materials for the pole barn at Menards for a total amount of $14,072.40. [*See* Pl. Ex. 4A-C]. On September 14, 2009, framing of the pole barn began, and Plaintiff made out a check payable to the LLC in the amount of $6,000 as required by the contract. [Pl. Ex. 3B]. The structure of the contract tells the court that this advance was intended to cover labor needed to proceed with the job. Although a crew of four or five people worked on construction of the pole barn for approximately two weeks, in early October work stopped. At that time, framing of the pole barn was approximately eighty-five percent complete. In addition to completing framing, remaining work included installing the doors and the exterior metal walls and roof. According to Defendant, the cost of metal to complete the job was approximately $15,000. By September 30, 2009, the balance in the LLC's checking account was only $4,355.37.

After trying to contact Defendant multiple times, during the week of October 12, 2009, Defendant told Plaintiff that he was ill. According to Defendant he had the swine flu and was unable to work. Defendant testified that he chose not to send a work crew to Plaintiff's job site without him and that he instead had the crew work on a job at the house next door to Defendant. Plaintiff spoke to Defendant again during the last week of October. At that time, Defendant told him not to worry, that the framing would be completed the next day, and that he would order the metal for completion of the pole barn and it would be delivered by the end of the week. However, framing was not completed, and Defendant never ordered the

3

metal required for completion. Although Defendant testified that the metal was not ordered because Plaintiff never chose the color, the court credits Plaintiff's testimony that he told Defendant the colors he had chosen in October.

Plaintiff testified that the LLC's tool trailer had originally been at the job site each day but during October, it would be gone for a few days, then for a week at a time. At the end of October, at a time when the tool trailer was back on Plaintiff's job site, Plaintiff broke into the trailer in order to determine whether it actually contained tools to use for work on the pole barn. Plaintiff testified that he did not intend to take anything, and there is no suggestion that anything was taken from the trailer. According to Plaintiff, right after the break in, he went to Defendant's home and apologized for doing so. Defendant, on the other hand, testified that Plaintiff never told him who broke into the tool trailer.

In any event, there is no dispute that the parties' relationship had deteriorated by early November when Plaintiff went to Defendant's home to talk to him since, according to Plaintiff, it was apparent that Defendant was not going to finish the pole barn. At that time, Defendant told Plaintiff that he would have to put the $12,000 balance that would be owed on completion of the contract into an escrow account with Defendant's attorney. Plaintiff refused, and Defendant caused the LLC to perform no further work on the pole barn.

As winter was approaching, Plaintiff paid another construction company to complete the pole barn at a cost of approximately $30,000. On November 20, 2012, Defendant individually signed a Cognovit Note in favor of Plaintiff in the principal amount of $15,000 with interest at 3% per annum "as settlement for an alleged default" on the contract to build the pole barn. [Pl. Ex. 12A]. While Defendant has made some payments on the note, it is undisputed that the note has not been paid in full.

**LAW AND ANALYSIS**

**I. 11 U.S.C. § 523(a)(2)(A)**

Plaintiff seeks a determination that a debt owed to him by Defendant in connection with the construction of the pole barn is nondischargeable under 11 U.S.C. § 523(a)(2)(A). Exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the debtor. *Rembert v. AT&T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998).

Section 523(a)(2)(A) excepts from discharge a debt " for money, property, [or] services,. . . to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . ." In order to except a debt from discharge under this section due to false pretense or false representation, a plaintiff must prove the following elements

by a preponderance of the evidence: (1) the debtor obtained money, property, services or credit through a material misrepresentation, either express or implied, that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) the creditor's reliance was the proximate cause of loss. *Rembert,* 141 F.3d at 280-81. A debtor's intent to defraud a creditor is measured by a subjective standard and must be ascertained by the totality of the circumstances of the case at hand. *Id.* at 281-82. A finding of fraudulent intent may be made on the basis of circumstantial evidence or from the debtor's "course of conduct," as direct proof of intent will rarely be available. *Hamo v. Wilson (In re Hamo),* 233 B.R. 718, 724 (B.A.P. 6th Cir. 1999). However, "if there is room for an inference of honest intent, the question of nondischargeability must be resolved in favor of the debtor." *ITT Final Servs. v. Szczepanski (In re Szczepanski),* 139 B.R. 842, 844 (Bankr. N.D. Ohio 1991).

The preamble to Section 523(a)(2)(A) states that the exception to discharge applies to any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by" certain specified misconduct. Defendant owes a debt to Plaintiff evidenced by the Cognovit Note, although Plaintiff's contract was with the LLC and his $30,000 check was deposited into the LLC's bank account. The United States Court of Appeals for the Sixth Circuit holds that a creditor may fall within § 523(a) discharge exceptions by proving some direct or indirect tangible or intangible financial benefit to the debtor. *See Brady v. McAllister (In re Brady),* 101 F.3d 1165, 1172 (6th Cir. 1996)("We therefore reject debtor's implication that a debt is nondischargeable under section 523(a)(2)(4) only when the creditor proves that the debtor directly and personally received every dollar lost by the creditor."); *cf. Cohen v. De La Cruz,* 523 U.S. 213, 218 (1998)**("**all liability arising from fraud" is nondischargeable**);** *Marks v. Hentges (In re Hentges),* 373 B.R. 709, 728-29, n.14 (Bankr. N.D. Okla. 2007)(notes an issue post-*Cohen* whether the 'benefits theory" has been abrogated and thus no proof of benefit to the debtor is required to bring a debt within an exception to discharge); *First Am. Title Ins. Co. v. Speisman (In re Speisman),* 495 B.R. 398, 403 (Bankr. N.D. Ill. 2013)(same). In *Brady*, a creditor successfully established a benefit to the debtor with proof that a corporation he controlled received $40,000 of the creditor's money. A third party may thus be the direct beneficiary of a fraud, but if a debtor is the perpetrator and obtains some indirect benefit, the debt owed to the injured party may be found to be nondischargeable. *Haney v. Copeland (In re Copeland),* 291 B.R. 740, 760-61 (Bankr. E.D. Tenn 2003).

As the Sixth Circuit recently declined to do, *Leonard v. RDLG, LLC (In re Leonard)*, 644 Fed. Appx. 612, 618, 619 (6th Cir. Mar. 28, 2016), this court need not decide whether "the benefit theory" of "obtained

by" applied in *Brady* is a required element of proving a cause of action under § 523(a)(2)(a) after *Cohen*. The court finds that Defendant did obtain a financial benefit from Plaintiff's payment deposited into the LLC's bank account. Defendant was the principal of and controlled the LLC. It provided his livelihood. As the bank statements show, this payment kept the LLC going through August 2009. Also, on September 3, 2009, the sum of $2,510.00 was paid from the LLC bank account to Defendant. [Pl. Ex. 8R]. The court infers that it is unlikely this payment would have been possible had Plaintiff's check not bulked up the account as it did in August. Plaintiff's check was the largest deposit by a factor of two in those two months. [Pl. Exs. 7A, 7D]. The court finds that Plaintiff has presented sufficient facts, if necessary as a matter of law, to show he conferred a financial benefit on Defendant within the *Brady* analysis, warranting the court's further consideration of whether a debt owed by Defendant to Plaintiff arose from Defendant's conduct of a kind proscribed by § 523(a)(2)(A).

Two representations by Defendant are at issue in this case.

Plaintiff first argues that Defendant never intended to cause the LLC to complete construction of the pole barn and that, as a result, he incurred approximately an additional $30,000 expense. While a mere breach of contract will not support a finding of fraud, "any debtor who does not intend to perform a contract from its inception has knowingly made a false representation." *Stifter v. Orsine (In re Orsine),* 254 B.R. 184, 188 (Bankr. N.D. Ohio 2000). Plaintiff has not met his burden of proving that, at the time the contract was signed and he paid the $30,000, Defendant did not intend to have the LLC complete the pole barn.

The framing materials for the pole barn, as well as tools and equipment, were delivered to the job site. Defendant had a crew of four or five people working at the job site for approximately two weeks where they completed construction of eighty-five percent of the framing of the pole barn. It is clear that at the end of September, shortly after which work on the pole barn ceased, the LLC did not have funds in its checking account to purchase the metal required to finish to pole barn. According to Defendant, his cost for the metal would have been approximately $15,000 while the balance in the LLC's account was only $4,355.37 on September 30, 2009. Nevertheless, it was Defendant's position in November, in light of the deterioration in the parties' relationship by that time, that he would still complete the pole barn if Plaintiff deposited the $12,000 balance under the contract in escrow with Defendant's attorney. The court finds it unlikely that he would suggest such a course of action if he never intended to complete the pole barn. Whether or not Defendant was actually sick during the month of October, he did have his work crew performing another job during that time, perhaps in order to obtain funds that would be needed to buy the metal for Plaintiff's pole barn. The record is silent as to the amount of funds the LLC received during

October from other customers. But together with approximately $4,000 in the LLC's account and the $6,000 to which the LLC would have been entitled when the framing of the pole barn was complete, it is possible that the LLC would have had the funds to buy the metal to complete Plaintiff's pole barn. While Defendant's business practices may be suspect and while he may have breached the parties' contract, this evidence, without more, does not convince the court that Defendant never intended to cause completion of the pole barn at the time Plaintiff paid $30,000 to the LLC.

More problematic for Defendant is his representation to Plaintiff that he found a supplier in southern Ohio, J & H Construction, from which the materials for Plaintiff's pole barn would be purchased. There was no supplier called J&H Construction in southern Ohio from which Defendant intended to have the LLC buy materials for Plaintiff's project. That the framing materials were immediately purchased from Menard's within four days of the deposit of Plaintiff's check in the LLC's bank account, using approximately half of the funds advanced by Plaintiff, shows the court that Defendant knew this representation was false. Nor do Plaintiff's Exhibits 7A-7F and 8A-Z1 showing activity in the LLC's bank account through September 30, 2009, reflect any payments to a J & H Construction.

Given the fact that J & H Construction is the company name under which Defendant formerly did business and the fact that he knew he could deposit the check in the LLC's account rather than actually use it entirely for the purchase of materials for Plaintiff's pole barn, the court finds that he made the representation with the intent to deceive Plaintiff. That deception allowed the flexibility to juggle funds in the LLC's bank account as needed instead of using the entire $30,000 to buy materials for Plaintiff's pole barn as required by the contract. As it is, the LLC's National City account statements for August and September 2009 show Non-Sufficient Funds Fees being charged in each month. [Pl. Exs. 7C, 7E].

In making his first check payable to J & H Construction, Plaintiff relied on the information provided by Defendant as principal of the LLC. Plaintiff was justified in doing so to seize the precise protective advantage offered in the LLC's promotional materials of paying directly for project materials. The court does not see any red flags in the parties' described interactions up to that point that should have caused Plaintiff to dig deeper into the putative business of an entity called J & H Construction. Nor would the court expect a consumer like Plaintiff entering into a project like this to do so.

As a result of Plaintiff's justifiable reliance on Defendant's misrepresentation, the LLC was able to use some of the funds advanced by Plaintiff other than for the purchase of materials for Plaintiff's pole barn. Only $14,072.40 of Plaintiff's $30,000 payment was used to purchase the required materials. The balance of those funds was never refunded to Plaintiff and, as a result, he incurred the cost of purchasing

the remaining materials needed to finish the pole barn (*i.e.* the outside metal walls and roof). Defendant estimated that cost to be $15,000. Plaintiff's reliance was thus the proximate cause of his loss of $15,000, which is the amount Defendant individually agreed to pay Plaintiff pursuant to the Cognovit Note signed by him on November 20, 2012.

## II. Liquidation of Debt

In the Sixth Circuit, bankruptcy courts may also enter a final money judgment on the amount of a nondischargeable claim. *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965-66 (6th Cir. 1993)(*pre-Stern v. Marshall*, 564 U.S. 462 (2011)); *Hart v. Southern Heritage Bank (In re Hart)*, 564 Fed. Appx. 773, 776 (6th Cir. April 28, 2014)(post-*Stern*). The Sixth Circuit has never held, however, that a bankruptcy court must do so. *In re Leonard*, 644 Fed. Appx. at 620.

The court declines to enter a money judgment in favor of Plaintiff on the non-dischargeable debt. First, the prayer for relief in Plaintiff's complaint asks only for " the Bankruptcy clerk [sic] to not allow a discharge of this debt." [Doc. # 1]. Second, the trial record does not contain evidence allowing the court to liquidate the amount of the debt. While there is no dispute that Defendant made some payments on the Cognovit Note and that it has not been paid in full—-thus Defendant owes Plaintiff a nondischargeable debt–the court lacks evidence from which it can liquidate the amount for purposes of entering a money judgment. If it is necessary to do so, a state court can liquidate the debt and enter a money judgment on the non-dischargeable debt.

## **CONCLUSION**

For the foregoing reasons, the court finds that Plaintiff did not meet his burden of proving that Defendant never intended to complete the contract to build a pole barn for Plaintiff. The court further finds that Plaintiff did meet his burden of proving that Defendant misrepresented to whom the $30,000 check should be made payable for materials and that the debt owed by Defendant pursuant to the Cognovit Note is a debt for money obtained by that false representation that is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

The court will enter a separate judgment in accordance with this Memorandum of Decision.

### ###